DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY

MARCH TERM, 1915.

JOHANNA BROWN, ADMINISTRATRIX OF WILLIAM JACOBS, DECEASED, PLAINTIFF-APPELLANT, v. ERIE RAILROAD COMPANY, DEFENDANT-RESPONDENT.

Argued July 7, 1914—Decided September 25, 1914.

1. Chapter 35 of the laws of 1909 (*Pamph. L., p. 54; Comp. Stat., p. 4238*) provides that when a person is killed or injured when attempting to cross the tracks of a railroad company, by being struck by a locomotive or train where gates are maintained, and such gates are not down at the time of the injury, the question whether the person so killed or injured was or was not guilty of contributory negligence shall be determined by the jury. This is meant to render liable railroad companies running trains through cities at any rate of speed, and does not limit the liability of such companies for accidents at crossings where safety gates are established, whether within or without a city, unless the safety gates are lowered.

2. When the enacting clause of a statute is ambiguous the preamble may be resorted to to explain the intention of the law-maker.

3. Where the enacting clause of a statute is expressed in clear, unambiguous terms, the preamble cannot control the enacting part.

487

4. Chapter 96 of the laws of 1909 (*Pamph. L., p.* 137; *Comp. Stat., p.* 4238) provides that wherever a railroad company has installed safety gates to protect the traveling public at any crossing, any person shall, during such hours as posted notices shall specify, be entitled to assume that such safety gates are in good order and will be duly operated, unless a written notice, "Out of order," be posted in a conspicuous place at such crossing; and in any action brought for injuries to person or property, or for death, at such crossing, the plaintiffs shall not be barred because of the failure of the person injured or killed to stop, look and listen before passing over said crossing. *Held,* that the fact that no notice was posted by respondent at the crossing in question, cannot prevent the operation of this statute. To hold otherwise would be in effect to permit the respondent to reap the advantage of the failure to perform a duty which arises from the clearest implication.

5. No notice having been posted at the crossing in question, giving the hours when the gates were to be operated, the respondent cannot successfully controvert the statement that a person passing over the crossing was not entitled to assume that the gates were in proper order, especially in the absence of a notice that the gates were out of order.

6. Where the view of the deceased was obstructed by freight cars which stood within five feet of the crossing, and he could not see the approaching train until he had passed the freight cars, there being a distance of eight feet and three inches between the two tracks, whether the deceased in proceeding onward, under all the circumstances, exercised due care, presented a question for the jury.

7. This action was brought for death occasioned by the wrongful act of defendant, and the mother was the next of kin to whom the damages would go. The trial court directed the jury to allow what capital sum would represent the money which the mother had a reasonable expectation of receiving during her life; that it seemed from the evidence that she did not get over six dollars a week, and that the jury were to find how many weeks she had a reasonable expectation of receiving that, and then capitalize that into a fixed sum. *Held,* that the word "capitalize," as used, meant to convert a periodical payment into a sum in hand, and the jury are presumed to have so understood it, and the instruction so given, though not luminous, was technically correct.

8. The trial court excluded a question as to the earnings of the plaintiff's second husband, but the question was not directed to showing how much her second husband contributed to her support, but was merely introductory, and such ruling was not, in itself, harmful to the defendant.

On appeal from the Supreme Court.

For the appellant, *Alexander Simpson.*

For the respondent, *Collins & Corbin.*

The opinion of the court was delivered by

WALKER, CHANCELLOR. This was a suit for damages under the Death act. The disputed questions of fact were as to whether the view of the deceased was obstructed by freight cars at the crossing of the defendant company's tracks where the accident happened; also, whether any warning was given of the approach of the train by bell or whistle; also, whether the crossing gates were up or down at the time. The case was submitted to the jury who found for plaintiff, and defendant appeals.

The controverted questions of fact were involved in that of contributory negligence under chapter 35 of the laws of 1909 (*Pamph. L., p.* 54), wherein it is provided that when a person is killed or injured when attempting to cross the tracks of a railroad company, by being struck by a locomotive or train where gates are maintained and such gates are not down at the time of the injury, the question as to whether the person killed or injured was or was not guilty of contributory negligence shall be a question to be determined by the jury. The trial court permitted the jury to find liability against the defendant by reason of the fact, if it were a fact, that the gates were not down. The Supreme Court in reversing the judgment said this statute of 1909 was inapplicable, because the accident happened at a crossing partly in a township and partly in a borough, meaning, evidently, that the act applied only to crossings in cities. We cannot take that view.

The title of the act is unrestricted. It is: "An act relating to accidents at railroad crossings." The enacting clause is equally broad. It reads:

"1. Whenever any railroad company shall have assumed to establish and maintain what are known as safety gates at any railroad crossing in this State, and a person is killed or injured at any such crossing by being struck by a locomotive or train when attempting to cross the tracks at a time when

such gates are not down, as required by any statute giving the railroad the right to run through an incorporated city at any rate of speed they see fit, upon compliance with the provisions of such statute, that in all such cases the question whether the person so killed or injured, upon attempting to cross such railroad crossing, at a time when the safety gates at such crossing are not down, was or was not guilty of contributory negligence, shall be a question to be determined by the jury, in all actions brought to recover damages for such loss of life or personal injury."

It is true, the act contains a preamble, as follows:

"WHEREAS, By the provisions of the statutes of this State, it has been provided that whenever a railroad company shall have enclosed its right of way through an incorporated city of this State with a fence, wall or embankment, and shall have established and maintained gates at street crossings, as provided by the provisions of any statute of this State, that upon such compliance with such provisions the said railroad company could run over the part of their said so enclosed road through any incorporated city of this state 'at any rate of speed they may deem proper, and that such speed should not, thereafter, be restrained by any city ordinance to regulate the same.' "

The provision in the enacting clause that where a person is killed or injured when such gates are not down "as required by any statute giving the railroad the right to run through any incorporated city at any rate of speed they may see fit, upon compliance with the provisions of such statute," is meant not to excuse, but to render liable, railroad companies running trains through cities at any rate of speed; and is not meant to limit the liability of railroad companies for accidents on railroad crossings where safety gates are established, wherever those crossings may be, whether within or without the limits of an incorporated city, unless the precautionary measure of lowered gates is an accomplished fact on the given occasion.

It seems to be established that in cases of doubt as to the proper construction of the body of a statute, resort must be

had to the preamble or recitals for the purpose of ascertaining the legislative intent. But where the enacting part of the statute is unambiguous, its meaning will not be controlled or affected by anything in the preamble or recitals. The enacting clause of a statute may be extended by the preamble, but cannot be restrained by it. 36 *Cyc.* 1132; *Den* v. *Urison,* 2 *N. J. L.* \*212, 224; *James* v. *Dubois,* 16 *Id.* 285; *Quackenbush* v. *State,* 57 *Id.* 18, 21.

In *Cooper Hospital* v. *Camden,* 70 *N. J. L.* 478, it is laid down by the Supreme Court that to ascertain the intention of the legislature we must look at the preamble of the act, citing from *Pott. Dwar. Stat.* 265, as follows:

"The preamble states with more or less accuracy the object of a law and the occasion of its making. Its first legitimate and unquestioned use is to ascertain what the cases are to which the act was intended to apply. It has never been disputed that the preamble to an act may properly be used to ascertain and fix the subject-matter to which the enacting part is to be applied."

There is nothing in this which is inconsistent with what was said in *Den* v. *Urison, supra,* by Mr. Justice Pennington in the Supreme Court (2 *N. J. L.* \*224), viz.:

"It appears to me, to be a settled principle of law, that the preamble cannot control the enacting part of the statute, in cases where the enacting part is expressed in clear, unambiguous terms; but in case any doubt arises on the enacting part, the preamble may be resorted to, to explain it, and show the intention of the lawmaker. The enacting part of this statute is clear and explicit; there is no ambiguity on the face of it. Shall we then go out of the enacting part, which is clear and intelligible, and resort to the preamble, to create an ambiguity, and then have recourse to the same preamble, to explain this ambiguity? It appears to me, that this would be carrying the office of the preamble beyond anything heretofore contemplated, by giving it a paramount authority to the enacting part of the statute itself."

Nor is there anything in that case (Cooper Hospital *v.* Camden) which is inconsistent with the doctrine held by the

Supreme Court in *Quackenbush* v. *State,* 57 *N. J. L.* 18 (at *p.* 21), wherein it was said:

"It is well settled that where the intention of the legislature is clearly expressed in the purview or body of the act the preamble shall not restrain it, although it be of much narrower import. *Sedgw. Stat. & Const. L.* 43.

"The preamble cannot restrict the enacting clauses except where their language is ambiguous or uncertain. *Pott. Dwar. Stat.* 267; *End. Stat.* 82; 1 *Kent* 460; *Den* v. *Dubois,* 1 *Harr.* 285, 295."

Now, the enacting clause of chapter 35 of the laws of 1909, omitting reference to existing law requiring safety gates to be down when trains are approaching and passing, reads as follows:

"1. Whenever any railroad company shall have assumed to establish and maintain what are known as safety gates at any railroad crossing in this state, and a person is killed or injured at any such crossing by being struck by a locomotive or train when attempting to cross the track at a time when such gates are not down, * * * that in all such cases the question whether the person so killed or injured, upon attempting to cross such railroad crossing, at a time when the safety gates at such crossing are not down, was or was not guilty of contributory negligence, shall be a question to be determined by the jury, in all actions brought to recover damages for such loss of life or personal injury."

The requirement referred to in the omitted portion of the above-quoted enacting clause, reads as follows:

"Cause the same (gates) to be closed at least half a minute before any train may cross such highway and until such train shall have passed by."

Inserting this provision (which is contained in section 22 of the General Railroad act) into chapter 35 of the laws of 1909, instead of the reference to it contained in the statute, it would read as follows:

"1. Whenever any railroad company shall have assumed to establish and maintain what are known as safety gates at any railroad crossing in this state, and a person is killed or in-

jured at any such crossing by being struck by a locomotive or train when attempting to cross the tracks at a time when such gates are not down (*at least half a minute before any train may cross such highway and until such train shall have passed by*), that in all such cases the question whether the person so killed or injured, upon attempting to cross such railroad crossing, at a time when the safety gates at such crossing are not down, was or was not guilty of contributory negligence shall be a question to be determined by the jury, in all actions brought to recover damages for such loss of life or personal injury."

The only provision of the Railroad law which authorizes a company to run its trains through a city at any rate of speed is section 22 (*Comp. Stat., p.* 4230), and reads as follows:

"Any railroad company may erect a fence or other enclosure around its stations so as to prevent persons other than passengers from coming near its trains, and may exclude from such enclosures all persons except travelers; where any railroad company in any city shall maintain along its roadway where the same may adjoin a public highway, a fence or embankment four feet high, sufficiently close and strong to prevent children and horses from going through the same, or where its tracks shall be laid in a cut at least four feet deep, and shall provide on each side of the track at any highway crossing in such city a gate of like height and sufficiency, and cause the same to be closed at least half a minute before any train may cross such highway and until such train shall have passed by, in such case it shall be lawful for such company to run its trains in said city over the portions of its railroad thus protected and over the portions not adjoining or crossing any highway, at such rate of speed as it deems proper, but in the absence of such protection and safeguard, the company shall be bound by lawful and reasonable municipal ordinances regulating the speed of its trains along streets and at crossings."

The enacting clause of chapter 35 of the laws of 1909, which provides that when gates are not down as required by any statute giving a railroad the right to run its trains through an incorporated city at any rate of speed it may see

fit, when read in connection with section 22 of the General Railroad law, giving such right—provided the gates shall be closed at least half a minute before any train may cross the highway and until such train shall have passed by—makes the question of contributory negligence—when a person is injured or killed at such crossing when the gates are up—a jury question; the inference being, that if the gates are up there is an invitation to persons to cross upon an assumption that there is no danger to be apprehended from an approaching train.

Gates at railroad crossings in cities' are not the only ones provided for in the statute. By section 36 of the General Railroad law, it is provided that whenever the governing body of any township or municipality shall so direct, an application shall be made to the Court of Chancery for an order that gates shall be erected across any one or more streets or highways where the same are crossed by a railroad track at grade, and that a flagman shall be stationed there, or that some other reasonable provisions for protecting such crossing shall be adopted.

It may have been in virtue of proceedings under this section that the gates in question were installed, or the company may have "assumed" to establish and maintain them as mentioned in chapter 35 of the acts of 1909. Whatever the authority or reason for their erection, they must be operated—that is, raised and lowered, and, under chapter 35 of the acts of 1909, must be down when a train approaches and passes a highway, in order to afford protection to the company for death or injury to persons.

The Supreme Court, in *Wolcott* v. *New York and Long Branch Railroad Co.,* 68 *N. J. L.* 421, decided that when a railroad company assumes to protect a highway crossing by a flagman, it is responsible for injuries received at that crossing, by a traveler on the highway, which have resulted solely from the negligence of such flagman; and that responsibility exists, notwithstanding that the company is under no legal obligation to so protect the crossing. It is the same in reference to gates voluntarily installed. And this was expressly provided in

chapter 96 of the laws of 1909. *Pamph. L., p.* 137. And we think that that act is also applicable in the case at bar. It provides:

"Wherever any railroad whose right of way crosses any public street or highway, has or shall install any safety gates, bell or other device designed to protect the travelling public at any crossing or has placed at such crossing a flagman, any person or persons approaching any such crossing so protected as aforesaid, shall, during such hours as posted notice at such crossing shall specify, be entitled to assume that such safety gates or other warning appliances are in good and proper order, and will be duly and properly operated unless a written notice bearing the inscription 'out of order' be posted in a conspicuous place at such crossing, or that the said flagman will guard said crossing with sufficient care whereby such traveler or travelers will be warned of any danger in passing over said crossing, and in any action, brought for injuries to person or property, or for death caused at any crossing protected as aforesaid, no plaintiff shall be barred of the action because of his failure of the person injured or killed to stop, look and listen before passing over said crossing."

The argument made by the respondent that because there was no notice posted at the crossing in question specifying at what hours the gates were to be operated, the provision is not applicable, is unsound. To sanction such a view would, in effect, be to hold that a railroad company by failure, willful or otherwise, to observe the spirit of the act, and regard as a mandate that which is not enjoined in terms but arises from the clearest implication, namely, that it *shall* post such notice at the given crossing, could defeat the beneficent purposes of the act.

As no notice was posted by the defendant at the crossing in question, giving information as to the hours when the gates were to be operated, the company will not be heard to complain that a person passing over the railroad tracks at the crossing was not entitled to assume that the gates were in good and proper order and would be duly and properly operated, especially as there was no notice present bearing an

inscription that the gates were out of order. This act may be said to be equally as strong for the plaintiff as the prior one, because it provides that in the situation in which this plaintiff's intestate found himself, the action is not barred because of his failure "to stop, look and listen before passing over such crossing," while the former provides that whether he "was or was not guilty of contributory negligence shall be a question to be determined by the jury."

We also think that the facts of the case under consideration are clearly distinguishable from those present in *Lindsay* v. *Pennsylvania Railroad Co.*, 78 N. J. L. 704. In that case the deceased was partially deaf, and therefore it was his duty in approaching a railroad track, before entering thereon, to rely especially upon his sense of sight. It appeared that he was familiar with the crossing and of the movement of the train, and that while in a place of safety, four feet from the first rail of the track he had an unobstructed view in the direction in which the train came that struck him. But in the case under consideration, the view of the deceased was obstructed by a line of freight cars which stood within five feet of the crossing, and it was only when he passed the line of the obstructing freight cars that he was enabled to see the approaching train. Although there was a space of eight feet and three inches between the extreme end of the rails of the tracks— that is, from the track upon which the freight cars stood and the track upon which the train approached, we think that the circumstance that he was on a railroad track, a place of danger, without warning by the railroad company, a jury question was presented, whether the deceased, in proceeding onward, acted under all the circumstances, with that degree of care and prudence which an ordinarily prudent person would have exercised under like circumstances.

Aside from the question of contributory negligence the defendant-respondent urges sustaining of the Supreme Court's decision because of alleged error in the trial judge's charge with respect to the measure of damages. That portion of the charge excepted to on the question of damages is as follows:

"You have to say, in your best judgment, if you come to the

question of damages, what capital sum—which is your verdict —whatever it may be, would represent the money which his mother had a reasonable expectation of receiving from him during the term of her natural life, and it would seem, from the evidence in this case, that she did not get over $6 per week. You have to say how many weeks you think she had a reasonable expectation of receiving that, and then capitalize that in a fixed sum, and let that be your verdict."

In this instruction the judge told the jury that their verdict should be the capital sum which "would represent the money which his mother had a reasonable expectation of receiving from him during the term of her natural life, and it would seem, from the evidence in this case, that she did not get over $6 per week."

Defendant's counsel argues that this comes under the ban of this court's decision in *Hackney* v. *Delaware and Atlantic Telephone Co.*, 69 *N. J. L.* 335, where Mr. Justice Fort said (at *p.* 337), speaking of the verdict in that case:

"That was giving to the widow and next of kin as a present value the whole amount which the jury might find the intestate, had he lived, would have given to the widow and next of kin, in installments, at future periods, during the whole of his life. Such an instruction does not take into account the fact that the widow and next of kin will come into the present possession of the fund with the future income thereof. What the plaintiff is entitled to recover is a 'capital fund' (so to speak) which shall represent the present value of all the pecuniary loss which will fall upon the widow and next of kin by the premature taking off of the intestate."

If any vice inheres in the first sentence of the portion of the charge excepted to, it may be said to be cured by the second sentence which was:

"You have to say how many weeks you think she had a reasonable expectation of receiving that, and then capitalize that in a fixed sum, and let that be your verdict."

This was equivalent to saying that the jury should say how many weeks they thought the mother had a reasonable expectation of receiving from decedent $6 or less—the jury fixing

the number of weeks and the sum per week—and that the sum so ascertained should be capitalized.

True, the trial judge did not define the word "capitalize" as applied to the measure of damages with which he was dealing. Counsel for the defendant give the definition of "capitalize" from the Standard Dictionary, including, "(2) to convert (a periodical payment) into a sum in hand."

If the jury understood the meaning of the word "capitalize" as thus defined, and they are presumed to have so understood it, then they were given a technically correct, though not luminous, instruction.

The defendant did not prefer any requests to charge as to the law of damages, and relies solely upon the exception to the charge as delivered. We think the instruction is not reversible error.

Defendant also urges that the Supreme Court's judgment should be sustained because there was error in the trial court's overruling an inquiry as to the earnings of the plaintiff's second husband, claiming that that would tend to show that plaintiff's pecuniary loss would not be as great as if her deceased son were her sole support. The question which was asked and overruled was this:

"Q. 'He [referring to plaintiff's husband] makes good wages, doesn't he?' "

If the question had been directed to showing how much the plaintiff's second husband contributed toward her support, it doubtless would have been error to overrule it; but the overruling of the introductory question could not in and of itself have been harmful to the defendant.

The other alleged errors we think unsubstantial. The judgment of the Supreme Court should be reversed, to the end that the judgment of the Circuit Court shall stand.

*For affirmance*—BERGEN, J.   1.

*For reversal*—THE CHANCELLOR, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, BOGERT, HEPPENHEIMER, WILLIAMS, JJ.   9.